# No. 22-7146

## United States Court of Appeals for the District of Columbia Circuit

◆

PETER A. CHIEJINA, AND PICCOL NIGERIA, LTD.,

*Petitioners-Appellees,*

- v. -

FEDERAL REPUBLIC OF NIGERIA,

*Respondent-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**REPLY BRIEF OF FEDERAL REPUBLIC OF NIGERIA**

Tara M. Lee
Scott Lerner
Susan L. Grace
Benedict S. Bernstein
Helin C. Akcam
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC 20005
+1 202 626 3600

July 3, 2023                    *Counsel for Respondent-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS .................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

GLOSSARY ..................................................................................... vi

STATUTES AND OTHER AUTHORITIES ...................................... 1

SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT ...................................................................................... 3

    I.    THE FSIA DOES NOT PROVIDE SUBJECT-MATTER
         JURISDICTION AS TO MR. CHIEJINA OR HIS
         ACTION ................................................................................ 3

         A.    Mr. Chiejina Cannot Invoke The FSIA's
              "Arbitration" Exception Because Nigeria Never
              Agreed to Arbitrate with Mr. Chiejina ....................... 3

         B.    Petitioners Wrongly Confuse The FSIA's
              "Jurisdictional Task" with Other "Arbitrability"
              Questions ....................................................................... 9

         C.    Nigeria Did Not "Waive" Immunity as to Mr.
              Chiejiina by Signing the New York Convention ...... 12

    II.   THE DISTRICT COURT LACKED PERSONAL
         JURISDICTION OVER NIGERIA ................................. 15

CONCLUSION ................................................................................ 20

CERTIFICATE OF COMPLIANCE ............................................... 22

STATUTORY ADDENDUM ........................................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. Cases

*Al-Qarqani v. Arab Am. Oil Co.*,
   2020 WL 6748031 (S.D. Tex. Nov. 17, 2020) ....................................7

*Al-Qarqani v. Chevron Corp.*,
   8 F.4th 1018 (9th Cir. 2021) ...................................................7

*Al-Qarqani v. Saudi Arabian Oil Co.*,
   19 F.4th 794 (5th Cir. 2021) ...................................................7

*Animal Sci. Prods. v. Hebei Welcome*,
   138 S. Ct. 1865 (2018)..........................................................15

*Balkan Energy Ltd. v. Republic of Ghana*,
   302 F. Supp. 3d 144 (D.D.C. 2018)..........................................8, 9

*Berkowitz v. Republic of Costa Rica*,
   288 F. Supp. 3d 166 (D.D.C. 2018)...............................................19

*BG Group Plc v. Argentina*,
   572 U.S. 25 (2014)................................................................11

*Blasket Renewable Invs., LLC v. Kingdom of Spain*,
   2023 WL 2682013 (D.D.C. Mar. 29, 2023) .....................8, 12, 13, 15

*Chevron Corp. v. Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015).............................................4, 10, 11

*Creighton Ltd. v. Gov't of State of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999)..............................................12, 13

*Democratic Republic of Congo v. FG Hemisphere Assocs., LLC*,
   508 F.3d 1062 (D.C. Cir. 2007).................................................18

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005)...........................................17, 20

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
   225 F. Supp. 3d 18 (D.D.C. 2014)..............................................19

*F.R.G. v. Philipp*,
141 S. Ct. 703 (2021) ............................................................6

*\*First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*,
703 F.3d 742 (5th Cir. 2012) ...........................................6, 7

*\*G.E. Transp. S.p.A. v. Republic of Albania*,
693 F. Supp. 2d 132 (D.D.C. 2010)..............................17, 18

*\*Gater Assets Ltd. v. AO Moldovagaz*,
2 F.4th 42 (2d Cir. 2021) .................................................6, 7

*Granite Rock Co. v. Teamsters*,
561 U.S. 287 (2010)............................................................11

*Hardy Expl. & Prod. (India), Inc. v. Gov't of India*,
219 F. Supp. 3d 50 (D.D.C. 2016) ......................................19

*Int'l Road Fed'n v. Democratic Republic of the Congo*,
131 F. Supp. 2d 248 (D.D.C. 2001) ....................................17

*Ivanenko v. Yanukovich*,
995 F.3d 232 (D.C. Cir. 2021)............................................13

*LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871 (D.C. Cir. 2021)......................................10, 11

*Mani Kumari Sabbithi v. Major Waleed KH N.S. Al Saleh*,
623 F. Supp. 2d 93 (D.D.C. 2009).......................................20

*\*Marlowe v. Argentine Naval Comm'n*,
604 F. Supp. 703 (D.D.C. 1985).........................................18

*Orange Middle E. & Afr. v. Republic of Equatorial Guinea*,
2016 WL 2894857 (D.D.C. May 18, 2016).........................19

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
27 F.4th 771 (D.C. Cir. 2022) ("*P&ID II*")........................14

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
962 F.3d 576 (D.C. Cir. 2020) ("*P&ID I*") ............10, 13, 20

*Republic of Iraq v. ABB AG*,

769 F. Supp. 2d 605 (S.D.N.Y. 2011) ................................................8

*Republic of Sudan v. Harrison*,
   139 S. Ct. 1048 (2019).......................................................17, 18

*Simon v. Republic of Hungary*,
   812 F.3d 127 (D.C. Cir. 2016) ...........................................9

*Simon v. Republic of Hungary*,
   579 F. Supp. 3d 91 (D.D.C. 2021) .....................................9

*Tatneft v. Ukraine*,
   771 Fed. App'x 9 (D.C. Cir. 2019) ...................................13

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   30 F.3d 148 (D.C. Cir. 1994).......................................17, 20

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002)........................................13

**Foreign Cases**

*Deutsche Telekom v. India*,
   No. 12 Sch 7/21 (Berlin Dist. Ct. January 26, 2023)........................10

*Russian Fed'n v. Luxtona Ltd.*,
   2023 ONCA 393 (Ontario Ct. App. June 2, 2023) ...........................10

**Statutes and Rules**

28 U.S.C. § 517 ...............................................................12

28 U.S.C. § 1605(a) ................................ 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 16

28 U.S.C. § 1608(a) ..........................................2, 3, 17, 18, 19, 20

**Legislative Materials**

H.R. Rep. 94-1487 (1976)................................................16, 20

H.R. Rep. No. 91-1181 (1970).................................................14

S. Rep. No. 91-702 (1970) ...................................................14

# **Other Authorities**

Andreas Börner, *Article III, in Recognition and Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention* 126 (Herbert Kronke, et al. eds., 2010) ..................................................................................15

Conn. Gen. Stat. Ann. § 50a-100 (West), UNCITRAL Model Law on Internatinoal Commercial Arbitration ..........................................................................9, 10, 12

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2519 ("New York Convention") ........................5, 11, 13, 14

G.A. Res. 40/72 (Dec. 11, 1985) ..............................................................................14

W. Mark C. Weidemaier, *Sovereign Immunity and Sovereign Debt*, 2014 U. Ill. L. Rev. 67, 77 (2014) ..............................................................................15

*Authorities upon which Nigeria chiefly relies are marked with asterisks.

# <u>GLOSSARY</u>

| | |
|---|---|
| **A** | Joint Appendix |
| **AGREEMENT** | Contract entered into by Nigeria and PICCOL for the construction of gully erosion control structures in Nigeria's Imo State, dated April 20, 2005 |
| **FSIA** | Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*. |
| **NEW YORK CONVENTION** | Convention on the Recognition and Enforcement of Foreign Arbitral Awards |
| **NIGERIA** | Federal Republic of Nigeria |
| **PETITION** | Petition to Confirm Foreign Arbitral Award filed in the United States District Court for the District of Columbia on August 24, 2021 by Petitioners in civil action number 1:21-cv-02241-RJL |
| **PETITIONERS** | Mr. Peter A. Chiejina and PICCOL Nigeria Ltd. |
| **PICCOL** | PICCOL Nigeria Ltd. |

## STATUTES AND OTHER AUTHORITIES

Except for the materials set forth in the addendum to this brief, all pertinent statutes and other authorities are contained in Appellant's opening brief and Appellees' opposition brief.

# SUMMARY OF ARGUMENT

Petitioners concede there is no agreement to arbitrate between Mr. Chiejina and Nigeria.  Under the plain text of the FSIA and this Circuit's precedents, this ends the matter:   There is no subject-matter jurisdiction under § 1605(a)(6) for Mr. Chiejina's "action . . . to confirm an award" against Nigeria.

To escape this conclusion, Petitioners omit words from the FSIA's text, misstate the issues on appeal, and mischaracterize Nigeria's arguments.  But no attempt to confuse the FSIA's threshold "jurisdictional task" with unrelated and premature questions of "arbitrability" (which are not part of this appeal) can cure the simple fact that no agreement to arbitrate exists.  Absent the "defined legal relationship" created by such an agreement, there can be no jurisdiction.  As a result, this Court need not reach—and Nigeria has not asked it to reach—the distinct questions of arbitrability, which are properly raised only after Petitioners have established subject-matter jurisdiction under § 1605(a)(6), and which Petitioners cannot do as to Mr. Chiejina's action.  Likewise, the absence of an agreement to arbitrate precludes Petitioners' invocation of the "waiver" exception, § 1605(a)(1), based on Nigeria having signed the New York Convention.

Equally unavailing are Petitioners' attempts to circumvent the strict, hierarchical requirements of § 1608(a).  Despite conceding that the FSIA's service provisions are "mandatory" and must be strictly adhered to, Petitioners offer no

2

adequate explanation for why they did not serve Nigeria according to the special arrangement contained in the Agreement between PICCOL and Nigeria. Petitioners' accusation that Nigeria's position is "unusual" does not justify Petitioners' erroneous insistence than no such special arrangement exists. The plain text of the Agreement and this Circuit's precedents establish that the Agreement contains a special arrangement under § 1608(a)(1). That result comports with the text of the FSIA, Congress's express instructions, and binding case law, which mandate that Petitioners serve Nigeria's Ecological Fund Office, as dictated in the Agreement. They did not. Accordingly, no personal jurisdiction over Nigeria exists and the district court should have dismissed the suit.

## ARGUMENT

## I.    THE    FSIA    DOES    NOT    PROVIDE    SUBJECT-MATTER JURISDICTION AS TO MR. CHIEJINA OR HIS ACTION

### A.    Mr. Chiejina Cannot Invoke The FSIA's "Arbitration" Exception Because Nigeria Never Agreed to Arbitrate with Mr. Chiejina

As Petitioners concede, this case arises under the "agreement to arbitrate between Nigeria . . . and a private party, PICCOL[.]" Pet'rs' Opp'n Br. ("Opp'n") 1. Petitioners do not—and, indeed, cannot—identify any agreement giving Mr. Chiejina rights to arbitrate against Nigeria. The FSIA's "arbitration" exception, 28 U.S.C. § 1605(a)(6), therefore does not provide subject-matter jurisdiction as to Mr.

3

Chiejina or his "action . . . to confirm an award" against Nigeria, as described in Nigeria's Opening Brief ("Br.") and further detailed below.

*First*, as Nigeria has explained, Petitioners' argument is foreclosed by *Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015); Br. 13–15. As *Chevron* held, the "jurisdictional task" under § 1605(a)(6) is to determine whether Petitioners proffered "a valid arbitration agreement **between the parties**." 795 F.3d at 205 & n.3 (emphasis added). Thus, the FSIA "requires . . . the party challenging immunity" to "present[] *prima facie* evidence of an agreement **between the parties**." *Id.* (finding the "jurisdictional analysis" was satisfied only because the proffered documents "constituted an agreement **between the parties**" (emphasis added)).

To carry their burden, Petitioners must demonstrate not only that Nigeria was obligated to arbitrate, but also that Mr. Chiejina had a right to arbitrate. *Id.* at 206 (explaining that the FSIA "allows federal courts to exercise jurisdiction" only because Ecuador made a "standing offer . . . to arbitrate" and "Chevron accepted"). Petitioners cannot discharge even that "initial burden" of producing any agreement with Mr. Chiejina that could satisfy "the jurisdictional standard of the FSIA." *Id.* at 204–05.

*Second*, contrary to Petitioners' muddled reading, the text of the FSIA fully supports this result under *Chevron*. Purporting to invoke "the text of the statute," Petitioners omit words, rewriting the FSIA in an attempt to create support for their

arguments where none exists. *See* Opp'n 10–11, 16–18. To that end, Petitioners neglect to include the lengthy clause requiring that the "agreement made by the foreign state" must contemplate "differences which have arisen or which may arise *between the parties* with respect *to a defined legal relationship*, whether contractual or not." 28 U.S.C. § 1605(a)(6) (emphases added). Congress crafted this language specifically to align the FSIA with article II(1) of the New York Convention. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2519 ("New York Convention") (which also limits enforcement of arbitration agreements to instances where "the parties" are in "a defined legal relationship, whether contractual or not").[1]

Critically, Petitioners have not even attempted to identify any such "defined legal relationship" between Nigeria and Mr. Chiejina. Instead, Petitioners urge a dramatic expansion of the FSIA to allow *any* "party petitioning for confirmation" to invoke *any other* party's arbitration agreement. Petitioners base that argument on the slender reed of "[t]he indefinite article 'a'" in § 1605(a)(6), which Petitioners contend should be read to mean "any." Opp'n 16–17. That contention is not credible. Besides the indefinite article, the FSIA also uses the *definite* article ("the")

---

[1] Like § 1605(a)(6), article IV(b) and article V(1)(a) of the New York Convention also restrict the enforcement (confirmation) of arbitral awards to instances where the "agreement . . . to submit to arbitration" also satisfies article II.

when identifying "*the* parties" to the dispute, i.e., those parties with the "defined legal relationship" required by § 1605(a)(6). Petitioners' attempt to rewrite the statute must be rejected.

Petitioners' overbroad reading of § 1605(a)(6) contravenes basic principles of statutory construction and the Supreme Court's instruction to interpret the FSIA "to avoid, where possible, 'producing friction in our relations with [other] nations.'" *F.R.G. v. Philipp*, 141 S. Ct. 703, 714 (2021) (citation omitted). No individual phrase, much less a single indefinite article, can overcome the text and purpose of § 1605(a)(6) "as a whole." *See id.* at 712.

**Third**, Petitioners fail to rebut the case law summarized in Nigeria's Opening Brief bolstering this analysis. Tellingly, Petitioners do not identify **even a single case** where any claimant has satisfied § 1605(a)(6) based on the agreement of **another** party (such as PICCOL) absent an alternate ground for establishing a "defined legal relationship" in non-party claims.

For example, Petitioners attempt to distinguish two cases where the Fifth Circuit (*First Investment*) and Second Circuit (*Gater Assets*) rejected jurisdiction under § 1605(a)(6) on the basis that the sovereign **respondents** had no obligation to arbitrate—whereas, here, Nigeria challenges the **claimant's** rights to arbitrate. *See* Opp'n 15. That argument again has no basis in the text of § 1605(a)(6). That provision requires "an agreement to arbitrate" applicable to "the parties," and

6

recognizes no textual distinction between respondents and claimants. In fact, the fundamental issue in both cases was that the sovereign respondents had no defined legal relationship with the claimants, including based on any traditionally recognized principles applicable to non-parties. *See First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 754 (5th Cir. 2012) (rejecting the claimant's "alter ego" theory); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 67–70 (2d Cir. 2021) (rejecting the claimant's "direct benefits estoppel" theory).

In any event, courts have applied the same principles when evaluating whether specific claimants (like Mr. Chiejina) could invoke § 1605(a)(b). In *Al-Qarqani v. Saudi Arabian Oil Co.*, for example, the Fifth Circuit rejected jurisdiction under § 1605(a)(6) as to specific claimants precisely because there was "no agreement ***among the parties*** to arbitrate." 19 F.4th 794, 801–02 (5th Cir. 2021) (emphasis added). In that case, the claimants tried to invoke a wide range of "non-signatory" legal theories—but failed to prove any defined legal relationship. *See id.*; *see also Al-Qarqani v. Arab Am. Oil Co.*, 2020 WL 6748031, at *7–10 (S.D. Tex. Nov. 17, 2020) (rejecting the same non-party claimants' invocation of "incorporation by reference," "equitable estoppel," and "third-party beneficiary" during the first-instance proceedings); *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1026 (9th Cir. 2021) (rejecting the same non-party claimants' theories during parallel litigation).

Another recent decision by Judge Leon, presently on appeal to this Court (Case No. 23-7038), similarly considered whether a specific category of claimants ("EU investor[s]") could avail themselves of § 1605(a)(6) to enforce arbitral awards against Spain. *Blasket Renewable Invs., LLC v. Kingdom of Spain*, 2023 WL 2682013, at *1–2 (D.D.C. Mar. 29, 2023). Just as Nigeria signed an arbitration agreement with PICCOL here, Spain had indisputably signed the applicable treaty offering to arbitrate with ***other*** claimants (*i.e.*, "investors" from "non-EU countries"). *See id.* at *1. But Judge Leon reached the opposite conclusion in that case, holding that the "EU investor[s]" could not establish jurisdiction over any action to confirm an arbitral award under § 1605(a)(6) because the treaty was inapplicable "***as to them***." *Id.* at *2–4, 7 (emphasis added)).

For similar reasons, Petitioners cannot rely on *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 154 (D.D.C. 2018), which "hing[ed] on the assignment of the Award" to an assignee. *See* Opp'n 17. Unsurprisingly, "assignment" is a typical instance where courts do recognize a non-party's arbitration rights in New York Convention cases. *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 609 (S.D.N.Y. 2011) (citation omitted), *aff'd*, 472 F. App'x 11 (2d Cir. 2012). Under the assignment doctrine, therefore, the petitioner in *Balkan Energy* could satisfy § 1605(a)(6) based on the "defined legal relationship" between the assignee and the original counter-party. Accordingly, *Balkan Energy* provides

no support for Petitioners' efforts to delete the words, "defined legal relationship," from the statute. *See* Opp'n 17.

Finally, this Court should reject Petitioners' attempt to turn the affirmative obligation to make "FSIA immunity determinations on a claim-by-claim basis" under *Simon v. Republic of Hungary* into a rule that such immunity determinations are not made on a claimant-by-claimant basis. 812 F.3d 127, 141 (D.C. Cir. 2016). The conduct of the *Simon* litigation in fact illustrates just the opposite. *See Simon v. Republic of Hungary*, 579 F. Supp. 3d 91, 140 (D.D.C. 2021) (dismissing five plaintiffs' claims under § 1605(a)(3) based on their status as "Hungarian nationals at the time" of the alleged taking while allowing nine other non-Hungarian plaintiffs to proceed). There is nothing anomalous in the present case, therefore, about dismissing Mr. Chiejina's action under the FSIA and allowing PICCOL's (substantively identical) action to proceed.

## B. Petitioners Wrongly Confuse The FSIA's "Jurisdictional Task" with Other "Arbitrability" Questions

Petitioners improperly—and confusingly—attempt to address the issue of "arbitrability" during this appeal. Opp'n 11, 12–14. This argument is both premature and wrong, as detailed below.

*First*, in a footnote, Petitioners suggest that Nigeria has excluded judicial review of "arbitrability" by enacting the UNCITRAL Model Law. *Id.* at 12–13 & n.1. As Petitioners concede, however, the question of arbitrability is to be addressed

with the merits and is not part of the FSIA determination.  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 878 (D.C. Cir. 2021) (explaining that certain arguments as to "the arbitrability of a dispute [are not] jurisdictional question[s] under the FSIA").  And, under this Court's precedents, such merits issues cannot be addressed until after the FSIA jurisdictional issues are resolved.  *Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020) ("*P&ID I*") ("[C]ourts . . . must resolve colorable assertions of immunity before the foreign sovereign may be required to address the merits at all.").  Nigeria thus has not yet raised distinct arbitrability challenges, but reserves all rights to do so.[2]

**Second**, Petitioner wrongly relies upon *Stileks*, which concluded (following *Chevron*, 795 F.3d at 205–06) that "the scope" of disputes covered by an undisputed arbitration agreement—one of the subcategories of "arbitrability"—is not a

---

[2] Petitioners' attempt to exclude judicial review is wrong in the specific case of Nigerian law, which Petitioners themselves rely upon.  *See* Opp'n 12–13 n.1.  The relevant Nigerian statute is based upon the UNCITRAL Model Law, which itself allows for judicial review of arbitrability questions at Articles 34 and 36.  In fact, during the past few months, courts in Canada and Germany—which, like Nigeria, also enacted the UNCITRAL Model Law—have held explicitly that "the state court is not bound by the arbitral tribunal's decision on competence . . . , but the existence of an arbitration agreement is to be examined autonomously by the state court." *Deutsche Telekom v. India*, No. 12 Sch 7/21, at 15 (Berlin Dist. Ct. Jan. 26, 2023) (attorney translation); *see also Russian Federation v. Luxtona Ltd.* (2023), 2023 ONCA 393 ¶¶ 30–34, 43–49 (Can. Ont. C.A. June 2, 2023) (holding that the UNCITRAL Model Law "does not require any special deference . . . to an arbitral tribunal's determination of its own jurisdiction" and, rather, allows the reviewing court to conduct "a *de novo* hearing" of this issue).

jurisdictional issue under § 1605(a)(6).  *Stileks*, 985 F.3d at 878 (reaffirming that whether the dispute implicates "'matters beyond the scope of the submission to arbitration'" is a non-jurisdictional question that should be litigated under Article V(1)(c) of the New York Convention).

As the Supreme Court has explained, however, "arbitrability" is a broader category that includes not only "whether . . . a particular type of controversy" falls within the scope of the arbitration agreement—but also "whether the parties are bound by a given arbitration clause" at all.  *BG Group Plc v. Argentina*, 572 U.S. 25, 34–35 (2014) (describing "disputes over 'formation of the parties' arbitration agreement" as a distinct subcategory of arbitrability (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299–300 (2010))).  This latter subcategory of arbitrability question ("formation of the parties' agreement") was not at issue in *Stileks*.  985 F.3d at 878 (emphasizing Moldova's concession that this "scope" argument properly arose under Article V(1)(c) of the New York Convention).

And, as explained in *Chevron*, this latter "arbitrability" question as to the formation of an "arbitration agreement" between the parties *vel non* is explicitly recognized in the FSIA's text as a jurisdictional issue.  *Chevron*, 795 F.3d at 205–06.  *Chevron* thus requires a district court (and this Court) to "satisfy itself" that Nigeria genuinely "formed an agreement [to arbitrate] with all potential [claimants]," such as Mr. Chiejina, and cannot defer to the tribunal on this question

irrespective of the UNCITRAL Arbitration Rules.  *See id.* at 205–08 & n.3 (completing this "jurisdictional task" in Part II-B of the decision, before separately analyzing the effect of the UNCITRAL Arbitration Rules as part of the distinct "arbitrability" analysis in Part III of the decision).

Notably, the Kingdom of Spain and the European Union, as amicus curiae, have advanced these same points before a separate panel of this Court in *Blasket*, No. 23-7038 (D.C. Cir.).  Given the evident importance of this issue to numerous foreign sovereigns, this Court should consider inviting the views of the United States.  *See* 28 U.S.C. § 517; Order, *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, No. 21-7003 (D.C. Cir. Nov. 15, 2021) (inviting United States to file a brief amicus curiae concerning the FSIA's jurisdictional provisions).

### C. Nigeria Did Not "Waive" Immunity as to Mr. Chiejiina by Signing the New York Convention

Finally, Petitioners argue that Nigeria purportedly waived sovereign immunity under § 1605(a)(1) merely by signing the New York Convention—that is, regardless of whether Nigeria and Mr. Chiejina concluded any arbitration agreement.  Opp'n 19–24.  Judge Leon did not accept this argument in this case, and later rejected it in *Blasket*, 2023 WL 2682013, at *7–8.

Significantly, this argument is directly foreclosed by *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).  There, this Court recognized a waiver of sovereign immunity based on the New York Convention only where the

defendant sovereign (1) is "a signatory to the Convention" ***and*** (2) separately agreed "to arbitrate in the territory" of another signatory. *Creighton*, 181 F.3d at 123 (quotation marks omitted); *see also Blasket*, 2023 WL 2682013, at *8 (explaining that, under *Creighton,* where "[n]o such agreement [to arbitrate] exists," then the New York Convention itself is "insufficient to establish jurisdiction" under § 1605(a)(1)); *see also id.* (holding that the unpublished decision in *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019) did not, and could not, "overrule[] the requirement for a valid agreement to arbitrate" under *Creighton*); *P&ID I*, 962 F.3d at 584 ("*Tatneft* was an unpublished disposition, so it does not bind future panels.").

Indeed, the New York Convention never even mentions sovereign immunity, and does not fall into any of the three narrow recognized categories for "implied waiver." *See Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021) (explaining that foreign states implicitly waive immunity "by (1) executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (2) filing a responsive pleading without asserting sovereign immunity; or (3) agreeing to submit a dispute to arbitration in the United States"); *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002) ("[C]ourts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity.") (citation and quotation marks omitted).

13

In a recent case before this Circuit, the United States has thus strongly cautioned against interpreting the New York Convention as containing an implicit waiver, given that the United States itself is a party. *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775 (D.C. Cir. 2022) ("*P&ID II*") ("As the United States explained, our application of the waiver exception to the FSIA 'may have implications for the treatment of the United States in foreign courts and for our relations with foreign states.'" (quoting Br. for United States 1, 14–16)). If the New York Convention were itself a waiver of sovereign immunity, then the legislative history of the United States' ratification would have analyzed or at least referred to the topic. But the Congressional record is silent on this topic. *See generally* S. Rep. No. 91-702 (1970) (never addressing any waiver of the United States' sovereign immunity); H.R. Rep. No. 91-1181 (1970) (same).

Moreover, the text and history of the Convention show that the signatories were focused on private parties' "disputes arising in international commercial relations," rather than disputes involving sovereign parties. G.A. Res. 40/72 ¶ 5 (Dec. 11, 1985); *see also* New York Convention, art. I(3) (providing that State may limit enforcement "to differences . . . which are considered commercial"). There is no suggestion that the signatories were considering any issues pertaining to sovereign immunity, as multiple commentators have confirmed. *See* Andreas Börner, *Article III, in Recognition and Enforcement of Foreign Arbitral Awards: A*

14

*Global Commentary on the New York Convention* 126 (Herbert Kronke, et al. eds., 2010) ("The Convention does not contain any specific rules of international law regarding immunity in [recognition] proceedings."); W. Mark C. Weidemaier, *Sovereign Immunity and Sovereign Debt*, 2014 U. Ill. L. Rev. 67, 77 (2014) ("The New York Convention . . . does nothing to lift a sovereign's immunity from suit or execution.").

The European Union has recently confirmed this same point in *amicus curiae* submissions to the lower courts. *See e.g.*, EU Amicus Br. at 20–21, *AES v. Spain*, No. 21-CV-3249 (D.D.C. May 23, 2022) (explaining the New York Convention does not "evince [any] sovereign's intent to waive immunity" absent "valid consent to arbitration"). The European Union's views on this point of interpretation are "entitled to the Court's 'respectful consideration.'" *Blasket*, 2023 WL 2682013, at *8 n.6 (quoting *Animal Sci. Prods. v. Hebei Welcome*, 138 S.Ct. 1865, 1870 (2018)).

Accordingly, because Nigeria never agreed to arbitrate with Mr. Chiejina, there is no basis under the New York Convention to find any separate waiver as to Mr. Chiejina or his claims.

## II.    THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER NIGERIA

Petitioners are wrong that the FSIA "disregards" the preferences of a foreign sovereign in dictating the required methods of service. Opp'n 25. To the contrary, the FSIA reflects a clear preference for respecting the preferences of foreign states

by requiring service be made in accordance with any special arrangement wherever such an agreement exists.  *See* 28 U.S.C. § 1605(a)(1); Br. 17–18 (explaining that the methods for service in section 1605(a) are hierarchical and service must be made in accordance with a special arrangement for service where such an arrangement exists); *see also* H.R. Rep. 94-1487, at 24 (1976) ("The purpose of subsection [1608](a)(1) is to encourage potential plaintiffs and foreign states to agree to a procedure on service.").

Nor can Petitioners avoid the requirements of the FSIA by portraying Nigeria's insistence on its right to be served pursuant to the special arrangement in the Agreement as "surprising" or "unusual."  Opp'n 26, 31.  Even if it were true that foreign states—including Nigeria—have sometimes waived their right to demand strict compliance with the hierarchical service provisions of the FSIA, that would not alter Petitioners obligations.  Thus, Nigeria's positions in *P&ID* (Opp'n 27–28 & n.6)—which concerned an entirely different contract, different parties, and different award—have no bearing on the contract and questions at issue in this case. Here, Nigeria has designated the Ecological Fund Office as the department to receive service in this action, and section 1608(a)(1) required Petitioners to honor that designation.  *See* A29; *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054 (2019) (requiring strict adherence because "there are circumstances in which the rule of law demands adherence to strict requirements even when the equities of a particular case

16

may seem to point in the opposite direction"); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) ("strict adherence to the terms of 1608(a) is required"); *G.E. Transp. S.p.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 136–37 (D.D.C. 2010) (requiring service under a special arrangement for service where the contract between the parties included a notice provision); *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001) (same).  Petitioners' failure to do so requires dismissal.  *See Doe I v. State of Israel*, 400 F. Supp. 2d 86, 102 (D.D.C. 2005) (dismissing suit against Israeli government "for want of proper service" where "the record [was] devoid of any assertion that plaintiffs attempted to effect service" pursuant to § 1608(a)(2), as was required).

In an attempt to justify their non-compliance, Plaintiffs misrely on dicta in *Transaero* that describes the ministry of foreign affairs as the department of a foreign government "most likely to understand American procedure."  Opp'n 26.  Yet, the *Transaero* court's comment about service under section 1608(a)(3) cannot change the fact that section 1608(a)(3) is irrelevant where, as here, a special arrangement for service exists.  *See Harrison*, 139 S. Ct. at 1054 (holding that service under § 1608(a)(3) "may be used" only when service "is not possible under either of the first two methods"); *Democratic Republic of Congo v. FG Hemisphere Assocs., LLC*, 508 F.3d 1062, 1063 (D.C. Cir. 2007) ("28 U.S.C. § 1608(a) provides for

17

service . . . upon a foreign state by four alternative means, each . . . available only if the previously enumerated options are in some way foreclosed.").

Plaintiffs also fail to refute that Section 27 of the Agreement is a special arrangement for service within the meaning of section 1608(a)(1) of the FSIA. *See* Opp'n 31–37. As Nigeria has explained (at Br. 21), the Agreement encompasses "*[a]ny*" communication **"*required or authorised by this Agreement to be given by either party to the other*.**" A29 (emphases added). This language is broad and consistent with language that courts in this Circuit have upheld as creating a "special arrangement." *See G.E. Transp. S.p.A.*, 693 F. Supp. 2d at 136–37 (finding "a special arrangement for service on Albania" where notice provision stated "[a]ny notice to be given to [Albania] . . . shall be in writing" (alterations in original)); *Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703, 704, 707–08 (D.D.C. 1985) (finding "special arrangement" where notice provision encompassed "[a]ll notices, requests, demands, or other communications to or upon the respective parties hereto").

Moreover, Petitioners have no response to the fact that the cases on which they rely—and which the district court cited—involve notice provisions that are far narrower than the language of the Agreement. *See* Br. 22 (explaining that the notice provisions in *Berkowitz* and *Orange Middle East & Africa* were narrowly crafted to cover only limited types of communications). Likewise, in *Hardy Exploration* (cited

18

at Opp'n 32–33), the agreement identified "eighteen distinct types of notices" and the notice provision was limited to notices to be given "[t]hereunder." *Hardy Expl. & Prod. (India), Inc. v. Gov't of India*, 219 F. Supp. 3d 50, 61 (D.D.C. 2016). The court found that, in that contract, "hereunder" meant "specifically prescribed in the [agreement] itself" and, since service of process was not one of the eighteen types of notices identified, the agreement was not a special arrangement for service. *See id.*; *see also Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014) (cited at Opp'n 30, 33) (general notice provision could not create a special arrangement because "other sections" of the agreement "explicitly contemplate[d] legal service").

Petitioners are also wrong that section 1608(a)(1) must be construed "narrowly" in a way that would deprive foreign states of their sovereign immunity. Opp'n 29. Petitioners do not dispute that, in the cases where courts have construed 1608(a)(1) narrowly, they have done so to respect a foreign state's immunity and find ***against*** personal jurisdiction. *See* Br. 23–24. This reflects an application of a core objective of sovereign immunity under the FSIA, which is to shield sovereigns "from trial and the attendant burdens of litigation." *P&ID I*, 962 F.3d at 584. Indeed, Petitioners concede this point and do not cite any authority that supports the opposite approach. *See* Opp'n 30. Congress structured the § 1608(a)'s service provisions specifically to reflect the vitally important sovereign interests protected by the FSIA

by providing foreign states with the ability to adequately protect their interests through its provisions.  *See* H.R. Rep. 94-1487, at 24 (1976).  Nothing in those provisions requires a narrow construction as suggested by Petitioners.

Ultimately, Petitioners here failed to "strict[ly] adhere[] to the terms of 1608(a)," *Transaero, Inc.*, 30 F.3d at 154, and such failure mandates reversal and dismissal.  *See Doe I*, 400 F. Supp. 2d at 102 (dismissing suit against Israeli government "for want of proper service"); *Mani Kumari Sabbithi v. Major Waleed KH N.S. Al Saleh*, 623 F. Supp. 2d 93, 98 (D.D.C. 2009) ("The plain language of § 1608(a) makes clear that the FSIA lists the methods in descending order of preference . . . [l]eniency in this case would disorder the statutory scheme."). Petitioners cannot now demand a second chance where, despite knowing of the Agreement's notices provision, they simply ***chose*** not to "try each available method of service in the order prescribed" (Opp'n 25).  *See Doe I*, 400 F. Supp. 2d at 101 ("A plaintiff does not have the privilege to choose from among these four methods.").

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district court's order and remand with instructions to dismiss the Petition for lack of personal jurisdiction and/or to dismiss Mr. Chiejina as a Petitioner for lack of subject-matter jurisdiction.

Dated:        July 3, 2023                    Respectfully submitted,
              Washington, DC

**WHITE & CASE**

/s/ *Tara M. Lee*

Tara M. Lee (DC Bar No. 17902)
Scott Lerner (DC Bar No. 1024964)
Susan L. Grace
Benedict S. Bernstein
Helin C. Akcam
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:   + 1 202 626 3600
Facsimile:    + 1 202 639 9355
tara.lee@whitecase.com
scott.lerner@whitecase.com
susan.grace@whitecase.com
benedict.bernstein@whitecase.com
helin.akcam@whitecase.com

*Counsel for Respondent-Appellant*
*Federal Republic of Nigeria*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief contains 4,635  words (as calculated by the automatic word count function of Microsoft Word), excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This document complies with the typeface requirements of Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

**WHITE & CASE**

*/s/ Tara M. Lee*

Tara M. Lee (D.C. Bar No. 17902)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
Telephone: +1 202 626-3600
Facsimile: +1 202 639-9355
tara.lee@whitecase.com

*Counsel for Respondent-Appellant*
*Federal Republic of Nigeria*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2023, a true and correct copy of foregoing document was served by electronic filing on the following counsel of record:

> Theodore J. Folkman
> Rubin & Rudman LLP
> 53 State Street
> Boston, MA 02109
> 617-330-7135
> tfolkman@rubinrudman.com

> */s/ Tara M. Lee*
> Tara M. Lee (D.C. Bar No. 17902)
> WHITE & CASE LLP
> 701 Thirteenth Street, NW
> Washington, DC  20005
> Telephone: +1 202 626-3600
> Facsimile: +1 202 639-9355
> tara.lee@whitecase.com
>
> *Counsel for Respondent-Appellant*
> *Federal Republic of Nigeria*

# STATUTORY ADDENDUM

## <u>TABLE OF CONTENTS</u>

**Page**

UNCITRAL Model Rules, arts. 34 & 36.................................................................3a

*Deutsche Telekom v. India*,
No. 12 Sch 7/21 (Berlin Dist. Ct. January 26, 2023)...............................................8a

*Russian Fed'n v. Luxtona Ltd.*,
2023 ONCA 393 (Ontario Ct. App. June 2, 2023) ................................................11a

G.A. Res. 40/72 (Dec. 11, 1985)...........................................................................17a

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# UNCITRAL Model Law on International Commercial Arbitration

## 1985

### With amendments as adopted in 2006



UNITED NATIONS

Vienna, 2008

tribunal to correct in the award any errors in computation, any clerical or typographical errors or any errors of similar nature;

*(b)*  if so agreed by the parties, a party, with notice to the other party, may request the arbitral tribunal to give an interpretation of a specific point or part of the award.

If the arbitral tribunal considers the request to be justified, it shall make the correction or give the interpretation within thirty days of receipt of the request. The interpretation shall form part of the award.

(2)  The arbitral tribunal may correct any error of the type referred to in paragraph (1)*(a)* of this article on its own initiative within thirty days of the date of the award.

(3)  Unless otherwise agreed by the parties, a party, with notice to the other party, may request, within thirty days of receipt of the award, the arbitral tribunal to make an additional award as to claims presented in the arbitral proceedings but omitted from the award. If the arbitral tribunal considers the request to be justified, it shall make the additional award within sixty days.

(4)  The arbitral tribunal may extend, if necessary, the period of time within which it shall make a correction, interpretation or an additional award under paragraph (1) or (3) of this article.

(5)  The provisions of article 31 shall apply to a correction or interpretation of the award or to an additional award.

## CHAPTER VII.   RECOURSE AGAINST AWARD

### *Article 34.   Application for setting aside as exclusive recourse against arbitral award*

(1)  Recourse to a court against an arbitral award may be made only by an application for setting aside in accordance with paragraphs (2) and (3) of this article.

(2)  An arbitral award may be set aside by the court specified in article 6 only if:

    *(a)*  the party making the application furnishes proof that:

        (i)  a party to the arbitration agreement referred to in article 7 was under some incapacity; or the said agreement is not

*2012 UNCITRAL Model Law on International Commercial Arbitration*

> valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of this State; or

> (ii)    the party making the application was not given proper notice of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case; or

> (iii)    the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, only that part of the award which contains decisions on matters not submitted to arbitration may be set aside; or

> (iv)    the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, unless such agreement was in conflict with a provision of this Law from which the parties cannot derogate, or, failing such agreement, was not in accordance with this Law; or

> *(b)*    the court finds that:

> (i)    the subject-matter of the dispute is not capable of settlement by arbitration under the law of this State; or

> (ii)    the award is in conflict with the public policy of this State.

(3)   An application for setting aside may not be made after three months have elapsed from the date on which the party making that application had received the award or, if a request had been made under article 33, from the date on which that request had been disposed of by the arbitral tribunal.

(4)   The court, when asked to set aside an award, may, where appropriate and so requested by a party, suspend the setting aside proceedings for a period of time determined by it in order to give the arbitral tribunal an opportunity to resume the arbitral proceedings or to take such other action as in the arbitral tribunal's opinion will eliminate the grounds for setting aside.

## CHAPTER VIII.   RECOGNITION AND ENFORCEMENT OF AWARDS

### *Article 35.   Recognition and enforcement*

(1)   An arbitral award, irrespective of the country in which it was made, shall be recognized as binding and, upon application in writing to the

competent court, shall be enforced subject to the provisions of this article and of article 36.

(2)  The party relying on an award or applying for its enforcement shall supply the original award or a copy thereof. If the award is not made in an official language of this State, the court may request the party to supply a translation thereof into such language.[4]

*(Article 35(2) has been amended by the Commission at its thirty-ninth session, in 2006)*

### *Article 36.    Grounds for refusing recognition or enforcement*

(1)  Recognition or enforcement of an arbitral award, irrespective of the country in which it was made, may be refused only:

    *(a)*  at the request of the party against whom it is invoked, if that party furnishes to the competent court where recognition or enforcement is sought proof that:

        (i)   a party to the arbitration agreement referred to in article 7 was under some incapacity; or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

        (ii)  the party against whom the award is invoked was not given proper notice of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case; or

        (iii) the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

        (iv)  the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

---

[4]The conditions set forth in this paragraph are intended to set maximum standards. It would, thus, not be contrary to the harmonization to be achieved by the model law if a State retained even less onerous conditions.

> > > > (v)   the award has not yet become binding on the parties or has been set aside or suspended by a court of the country in which, or under the law of which, that award was made; or

> > > *(b)*   if the court finds that:

> > > > (i)   the subject-matter of the dispute is not capable of settlement by arbitration under the law of this State; or

> > > > (ii)   the recognition or enforcement of the award would be contrary to the public policy of this State.

(2)   If an application for setting aside or suspension of an award has been made to a court referred to in paragraph (1)*(a)*(v) of this article, the court where recognition or enforcement is sought may, if it considers it proper, adjourn its decision and may also, on the application of the party claiming recognition or enforcement of the award, order the other party to provide appropriate security.

**Kammergericht**

Ref.:      12 Sch 7/21



Certified copy

# Decision

In matters

**Deutsche Telekom AG**, represented by the Board of Directors, consisting of the Chairman Timotheus Höttges, Adel Al-Saleh, Srini Gopalan, Christian P. Illek, Thorsten Langheim, Dominique Leroy, Birgit Bohle and Claudia Nemat, Friedich-Ebert-Allee, 53113 Bonn - Applicant -.

Attorneys of Record:
Attorneys at law **Gleiss, Lutz, Hootz, Hirsch PartmbB,** Lautenschlagerstraße 21, 70173 Stuttgart, Gz.: 80109-21 WI/LRo/BjEb

against

**Republic of India**, represented by President of the Republic Draupadi Murmu, Rashrtrapati Bhavan, President's Estate, New Delhi, Delhi 110004, India - Respondent -.

Attorneys of Record:
Attorneys at Law **White & Case LLP**, Bockenheimer Landstraße 20, 60323 Frankfurt, Gz.: 9143405-0008.Diehlal.Belloel

the Kammergericht - 12th Civil Senate - by the Presiding Judge at the Kammergericht Dr. Hollweg-Stapenhorst, the Judge at the Kammergericht Kunz and the Judge at the Kammerge- richt Gabriel decided on 26.01.2023:

> The final award issued on 27 May 2020, by the arbitration panel consisting of the arbitrators
>
> Daniel M. Price, Prof. Brigitte Stern, and Prof. Gabrielle Kaufmann-Kohler (Chair), Ref.
>
> PCA Case No. 2014-10,

with regard to the operative part to a)

The Republic of India is required to pay Deutsche Telekom AG the amount of USD 93.3 million, plus interest on this amount at a rate of 2% p.a. above six-month USD LIBOR (or a comparable rate if LIBOR is discontinued in the future) compounded semi-annually from 17 February 2011 until payment in full;

in part in the amount of USD 10,000,000.00 plus interest in the amount fo 2 percentage points above the six-month USD LIBOR with semi-annual compounding declared enforceable since 17 February 2011.

Order the Respondent to pay the costs.

The decision is provisionally enforceable.

The value of the proceedings is set at up to €8,450,000.00.

REASONS

I.

\*\*\*

b.      There is an effective arbitration agreement between the parties based on the BIT. According to Art. 9 (2) b of the BIT, disputes between an investor of a contracting party and the other contracting party may be settled by arbitration in accordance with the UNCITRAL Rules. The formal requirements of Art. 9 BIT for arbitration are met, the Respondent does not object to this. However, the substantive requirements for the application of the BIT are also met, so that an effective arbitration agreement pursuant to Art. II UNC is to be assumed. The Respondent cannot rely on the fact that the arbitral award concerns a dispute which is not covered by the arbitration agreement in the BIT, a refusal of recognition and enforcement pursuant to Art. V para. 1 a and c, para. 2 a UNC is out of the question.

The Respondent has already raised the objection in the arbitral proceedings, so that it is not precluded from doing so in the enforceability proceedings (cf. Geimer in Zöller, loc. cit., Annex §1061, Art. V Rn. 2 BGH, decision of 16.12.2021, I ZB 31/21, juris Rn. 9, concerning a domestic arbitral award). In principle, the state court is not bound by the arbitral tribunal's decision on competence (see BGH, decision of 30.01.2013, III ZB 40/12, juris Rn. 15), but the existence of an arbitration agreement is to be examined autonomously by the state court. The court is also not bound by the decision of the Swiss Federal Court of December 2018 (Annex ASt 8), by which the application for setting aside of the Respondent against the Interim Award on the jurisdiction of the arbitral tribunal was rejected. Admittedly, the Swiss Federal Supreme Court, as the highest state court at the place of arbitration, confirmed the jurisdiction of the arbitral tribunal and stated with convincing reasoning that the conditions for the applicability of the BIT and a jurisdiction of the arbitral tribunal were met. However, this does not release the court in the enforceability declaration proceedings from its own examination of the facts, §328 ZPO is not relevant in this respect (cf. Geimer in Zöller, §1061 Rn. 23; a.A. OLG Brandenburg, decision of 20.05.2020, 11 Sch 1/19, juris Rn. 81).

However, an erroneous decision on the jurisdiction of the arbitral tribunal and the scope of the arbitration agreement cannot be established. As already stated above in connection with the admissibility of the application, the dispute of the Parties is subject to the rules of the Agreement. The Applicant is protected by the BIT as an indirect investor because the wording of the Agreement does not impose any restrictions on direct investments and the protective purpose of the Agreement establishes a broad scope of application.  In this respect, the Senate, after its own review, follows

# COURT OF APPEAL FOR ONTARIO

CITATION: Russian Federation v. Luxtona Limited, 2023 ONCA 393
DATE: 20230602
DOCKET: C70318

Fairburn A.C.J.O., MacPherson and Miller JJ.A.

BETWEEN

The Russian Federation

Applicant
(Respondent)

and

Luxtona Limited

Respondent
(Appellant)

Lincoln Caylor, Sabrina A. Bandali, Gannon Beaulne, Sakina Babwani, Shaan Tolani, for the appellant

Jonathan Lotz and Natali Antturi, for the respondent

Heard: April 3, 2023

On appeal from the order of the Divisional Court (Justices Calum U.C. MacLeod R.S.J., David L. Corbett and Freya Kristjanson), dated June 30, 2021, with reasons reported at 2021 ONSC 4604, setting aside the order of Justice Michael A. Penny dated December 13, 2019.

**MacPherson J.A.:**

## A.    INTRODUCTION

**\*\*\***

[29]    I do not accept this submission.

[30]    Article 16(1) of the Model Law provides that an arbitral tribunal may rule on its own jurisdiction. This principle, referred to variously as competence-competence, compétence de la compétence, or Kompetenz-Kompetenz, is fundamental to international commercial arbitration.

[31]    Competence-competence serves two primary functions. First, it resolves a legal loophole whereby an arbitral tribunal that finds itself lacking jurisdiction would, *ipso facto*, lose its ability to make a ruling to that effect: see Nigel Blackaby, K.C., Constantine Partasides, K.C., & Alan Redfern, *Redfern and Hunter on International Arbitration*, 7th ed. (Oxford: Oxford University Press, 2023). And second, it promotes efficiency by limiting a party's ability to delay arbitration through court challenges to the tribunal's jurisdiction: see *Uber Technologies Inc. v. Heller*, 2020 SCC 16, at para. 122 (per Brown J., concurring).

[32]    Thus, in *Dell Computers v. Union des consommateurs*, 2007 SCC 34, at para. 84, the Supreme Court of Canada set out a "general rule that … a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator."

[33]    That is precisely what happened in this case: the tribunal was provided with the first opportunity to resolve Russia's challenge to its jurisdiction.

[34]    That is as far as the competence-competence principle goes. It does not require any special deference be paid to an arbitral tribunal's determination of its

own jurisdiction. Competence-competence is best understood as "a rule of chronological priority" rather than as "empowering the arbitrators to be the sole judge of their jurisdiction": see Emmanuel Gaillard & John Savage, eds., *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (The Hague: Kluwer Law International, 1999), at paras. 659-60.



***

***

[40]   For these reasons, as the Singapore court held in *AQZ*, a court assessing an arbitral tribunal's jurisdiction is not limited to the record that was before the tribunal. Put another way, an application to set aside an arbitral award for lack of jurisdiction is a proceeding *de novo*, not a review of or appeal from the tribunal's decision.

[41]   However, that comes with a significant caveat. I agree with the following proposition, set out in the English case of *Electrosteel Castings Ltd v. Scan-Trans Shipping and Chartering Sdn Bhd*, [2003] 2 All E.R. (Comm) 1064, at para. 23 (Q.B.), and cited in *AQZ*:

> [N]othing said here should encourage parties to seek two evidential bites of the cherry in disputes as to the jurisdiction of arbitrators, not least because (1) evidence introduced late in the day may well attract a degree of scepticism and (2) the court has ample power to address such matters when dealing with questions of costs.

[42]   Accordingly, while there is no need to strictly apply the *Palmer* test, where a party has participated fully in the arbitration, its failure to raise a piece of evidence before the tribunal may be relevant as to the weight the court should assign that evidence.

### *(2) The "international consensus" issue*

[43]   The appellant's second submission is that the Divisional Court erred by saying that there was a "strong international consensus" in favour of its conclusion that a *de novo* hearing was appropriate in the circumstances of this case.

Page: 14

[44]    I do not accept this submission. During oral argument, counsel for Luxtona

referred to a single Singapore lower-court decision (*Government of the Lao*

*People's Democratic Republic v. Sanum Investments Ltd.*, [2015] SGHC 15) in

support of its position. However, the weight of international authority supports the

Divisional Court's conclusion. The leading case in this area, specifically relied on

by the Divisional Court, is *Dallah*, wherein a five-judge panel of the United Kingdom

Supreme Court addressed this issue.

[45]    In his reasons, Lord Mance said, at para. 30:

> The tribunal's own view of its jurisdiction has no legal or
> evidential value, when the issue is whether the tribunal
> had any legitimate authority in relation to the government
> at all. This is so however full was the evidence before it
> and however carefully deliberated was its conclusion.

[46]    In a similar vein, Lord Collins said, at para. 96:

> The consistent practice of the courts in England has been
> that they will examine or re-examine for themselves the
> jurisdiction of arbitrators. This can arise in a variety of
> contexts, including a challenge to the tribunal's
> jurisdiction… or in an application to stay judicial
> proceedings on the ground that the parties have agreed
> to arbitrate. Thus in *Azov Shipping Co v. Baltic Shipping*
> *Co*… Rix J. decided that where there was a substantial
> issue of fact as to whether a party had entered into an
> arbitration agreement, then even if there had been a full
> hearing before the arbitrator the court, on a challenge…
> should not be in a worse position than the arbitrator for
> the purpose of determining the challenge. This
> decision… is plainly right.

[47]    In a third judgment, Lord Saville said, at para. 160:

> In my judgment therefore, the starting point cannot be a review of the decision of the arbitrators that there was an arbitration agreement between the parties. Indeed no question of a review arises at any stage. The starting point in this case must be an independent investigation by the court of the question whether the person challenging the enforcement of the award can prove that he was not a party to the arbitration agreement under which the award was made. The findings of fact made by arbitrators and their view of the law can in no sense bind the court, though of course the court may find it useful to see how the arbitrators dealt with the question. Whether the arbitrators had jurisdiction is a matter that in enforcement proceedings the court must consider for itself.

[48]   Courts in several other countries, including Hong Kong, Singapore and Australia, have explicitly endorsed *Dallah* and followed its reasoning: see, for example, *S Co v. B Co*, [2014] 6 HKC 421; *AQZ v. ARA*, [2015] SGHC 49; *Sanum Investments Limited v. The Government of the Lao People's Democratic Republic*, [2016] SGCA 57; and *Lin Tiger Plastering Pty Ltd. v. Platinum Construction (Vic) Pty Ltd*, [2018] VSC 221.

[49]   Based on all of these authorities, I cannot conclude that the Divisional Court erred in determining that there was a "strong international consensus" in favour of a *de novo* hearing in the circumstances of this dispute.

### (3) The Article 16/Article 34 issue

[50]   The appellant's third submission is that the Divisional Court erred by concentrating on only Article 16 of the Model Law and ignoring Article 34. It was

10. *Expresses its appreciation* of the important role played by the International Trade Law Branch of the Office of Legal Affairs of the Secretariat, as the substantive secretariat of the Commission, in assisting in the implementation of the work programme of the Commission.

*112th plenary meeting*
*11 December 1985*

### 40/72. Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law

*The General Assembly,*

*Recognizing* the value of arbitration as a method of settling disputes arising in international commercial relations,

*Convinced* that the establishment of a model law on arbitration that is acceptable to States with different legal, social and economic systems contributes to the development of harmonious international economic relations,

*Noting* that the Model Law on International Commercial Arbitration[34] was adopted by the United Nations Commission on International Trade Law at its eighteenth session, after due deliberation and extensive consultation with arbitral institutions and individual experts on international commercial arbitration,

*Convinced* that the Model Law, together with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards[37] and the Arbitration Rules of the United Nations Commission on International Trade Law[38] recommended by the General Assembly in its resolution 31/98 of 15 December 1976, significantly contributes to the establishment of a unified legal framework for the fair and efficient settlement of disputes arising in international commercial relations,

1. *Requests* the Secretary-General to transmit the text of the Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law, together with the *travaux préparatoires* from the eighteenth session of the Commission, to Governments and to arbitral institutions and other interested bodies, such as chambers of commerce;

2. *Recommends* that all States give due consideration to the Model Law on International Commercial Arbitration, in view of the desirability of uniformity of the law of arbitral procedures and the specific needs of international commercial arbitration practice.

*112th plenary meeting*
*11 December 1985*

### 40/73. Consideration of effective measures to enhance the protection, security and safety of diplomatic and consular missions and representatives

*The General Assembly,*

*Having considered* the report of the Secretary-General,[39]

*Emphasizing* the important role of diplomatic and consular missions and representatives, as well as of missions and representatives to international intergovernmental organizations and officials of such organizations, in the maintenance of international peace and the promotion of friendly relations among States and also the need for enhancing global understanding thereof,

*Convinced* that respect for the principles and rules of international law governing diplomatic and consular relations, in particular those aimed at ensuring the inviolability of diplomatic and consular missions and representatives, is a basic prerequisite for the normal conduct of relations among States and for the fulfilment of the purposes and principles of the Charter of the United Nations,

*Deeply concerned* about the continued large number of failures to respect the inviolability of diplomatic and consular missions and representatives, and about the serious threat presented by such violations to the maintenance of normal and peaceful international relations, which are necessary for co-operation among States,

*Alarmed* by the increase of acts of violence against diplomatic and consular representatives, as well as against representatives to international intergovernmental organizations and officials of such organizations, which endanger or take innocent lives and seriously impede the normal work of such representatives and officials,

*Expressing its sympathy* for the victims of illegal acts against diplomatic and consular representatives and missions, as well as against representatives and missions to international intergovernmental organizations and officials of such organizations,

*Emphasizing* the duty of States to take all appropriate steps, as required by international law:

(*a*)  To protect the premises of diplomatic and consular missions, as well as of missions to international intergovernmental organizations,

(*b*)  To prevent any attacks on diplomatic and consular representatives, as well as on representatives to international intergovernmental organizations and officials of such organizations,

(*c*)  To apprehend the offenders and to bring them to justice,

*Noting* that, in spite of the call by the General Assembly at its previous sessions, not all States have yet become parties to the relevant conventions concerning the inviolability of diplomatic and consular missions and representatives,

*Convinced* that the reporting procedures established under General Assembly resolution 35/168 of 15 December 1980 and further elaborated in later Assembly resolutions are important steps in the efforts to enhance the protection, security and safety of diplomatic and consular missions and representatives,

*Desiring* to maintain and further strengthen those reporting procedures,

1. *Takes note* of the report of the Secretary-General;

2. *Strongly condemns* acts of violence against diplomatic and consular missions and representatives, as well as against missions and representatives to international intergovernmental organizations and officials of such organizations, and emphasizes that such acts cannot be justified;

3. *Emphasizes* the importance of enhanced awareness throughout the world of the necessity of ensuring the protection, security and safety of such missions, representatives and officials, as well as of the role of the United Nations in this regard;

4. *Urges* States to observe and to implement the principles and rules of international law governing diplomatic and consular relations and, in particular, to take all necessary measures in conformity with their international obligations to ensure effectively the protection, security

---

[37] United Nations, *Treaty Series*, vol. 330, No. 4739, p. 38.
[38] United Nations publication, Sales No. E.77.V.6.

[39] A/40/453 and Add.1-10.